**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )
                              )
-vs-                          )          Case No. CR-20-284-F
                              )
DAVID ASHARD SAMILTON,        )
                              )
          Defendant.          )

## ORDER

On March 15, 2021, defendant, David Ashard Samilton, filed a motion seeking to suppress evidence, asserting violations of his Fourth Amendment and Fifth Amendment rights.  Doc. no. 30.  Plaintiff, United States of America, responded in opposition to the motion.  Doc. nos. 34 and 37.  An evidentiary hearing was held on April 8, 2021.  As directed by the court, plaintiff filed a supplemental brief and defendant filed a response to the supplemental brief.  Doc. nos. 43 and 44. The court has carefully reviewed the parties' submissions and considered the evidence in the record.  The court concludes that defendant's motion should be denied.

I.

By indictment, defendant has been charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  The indictment also seeks forfeiture of the firearm and any and all magazines and ammunition pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).  Defendant moves to suppress the firearm and other physical evidence, claiming he was the subject of an unjustified and unreasonably prolonged investigatory detention.  He also moves to suppress

statements he made while detained and handcuffed in the patrol car, claiming the police officer failed to give him <u>Miranda</u> warnings before questioning him.

On the record at the conclusion of the evidentiary hearing, the court made the following findings of fact (reproduced here, warts and all):

> Of course, the events in this case occurred on -- in the early hours of September 13th of last year, 2020.  Sgt. Mark Garrett was not the only officer involved, but he was certainly, by any standard, the principal officer involved.

> Also involved was Lt. Reeder, a female, and one other officer who played -- certainly played a lesser role, Lt. Childs. And but by any standard, certainly, the main player in this encounter from a law enforcement standpoint was Sgt. Mark Garrett of the Oklahoma City Police Department. These events transpired at the Rodeway Inn at 321 South Rockwell, in Oklahoma City, which is a high crime area. I've certainly heard enough in this case and other cases to be able to very comfortably make that finding that this was a high crime area.

> Now, that doesn't mean that it's a black hole from a Fourth Amendment standpoint, but we do know from consistent authority from the circuit that that is not an irrelevant consideration.

> A call came in to the Oklahoma City Police Department or 911, and for some purposes they may be functionally the same, at least in this instance, to the effect that the desk clerk at the hotel, who we now know was Ms. Patel, had received a call about a dark-colored car sitting in the parking lot. It had sat there in the parking lot for several hours. The report at that point was that the car was occupied by a white male and a black female. And we know that that was half right. In fact, the male in the car was not a white male.

> The report also was that the individual -- the male in the car had a gun. And this brings us to what really does amount to a real-time account of the report from the hotel that is to be found on the third page of Government's Exhibit 2. And that report was -- and this is information that was going into Sgt. Garrett's head, if you will, on a contemporaneous basis that evening -- or I shouldn't say that evening, that morning. This was just a little bit after -- or in the wee hours, that

this was a black car occupied by a white male with a beard and a black female.

The report was unequivocally that the male had a gun in his hand. The report was that it was a -- this black car was a four-door car, that the male had gotten out of the car earlier and was knocking on doors, plural, and that had been parked there for four hours. The reporting party, which would be Ms. Patel, did not think that they were guests there.

And she concluded her report, as relayed to Sgt. Garrett, that she just wanted them gone if they were not staying there at that hotel or motel. So this was information incoming, if you will, to Sgt. Garrett. And that reporting party was identified as a -- the hotel clerk. At that point, one prominent concern for Sgt. Garrett was the fact that the -- there was a firearm, which had been visible in this car.

Under the circumstances of that report, as relayed to Sgt. Garrett, I find quite easily that this was not a routine sighting of a handgun. What he knew or had reported to him was that the car had been there for several hours, that the male in the car had a gun in his hand, the gun was visible. That, I quite readily find, is not a routine sighting of a handgun.  It's not like walking down the street or walking into a retail establishment and maybe seeing somebody with a gun in their holster as they, under certain circumstances, are now permitted by law to do. Under all of these circumstances, for the third time, that was not a routine sighting of a handgun.

Based on the length of time reported to Sgt. Garrett, the visibility of the gun, for that matter, the location in that part of town, Sgt. Garrett was concerned that the female might have been held in that car -- might have been being held in that car against her will. At a minimum, in my view, that amounts to a reasonable articulable suspicion of criminal activity. And I don't think it's required that he know for sure what criminal activity was afoot. At that point, in my view, Sgt. Garrett had a reasonable articulable suspicion of criminal activity.

As Sgt. Garrett approached the car, he heard the sound of what he thought was either a gun or a magazine hitting the pavement. It turns out he was as wrong about that as the clerk had been about the race of the male occupant of the car, but that's what he heard. And so it's natural to wonder, okay, is that a story that Sgt. Garrett made up conveniently for

purposes of this case? And the body cam video, in my view, persuasively rebuts any suggestion that Sgt. Garrett made up that story conveniently for purposes of this case because the body cam video plainly shows Sgt. Garrett persistently, doggedly looking for what it was that he thought he heard hit the pavement. And as an aside, I'll say that this body cam video, as far as I'm concerned, is a good cop's best friend, but that's beside the point.

So Sgt. Garrett believed he had heard the sound of a gun or a magazine hitting the pavement. This heightened his concern about the involvement of a gun in this entire situation. He approached the car. By his testimony, he saw movement toward the floorboard area as he approached the car. He considered that to be what the government at least has described in its papers as furtive movements, which, of course, is the term used in hundreds, if not thousands, of cases.

By Sgt. Garrett's account, he used his light and he looked through the back window of the car and could see through the back window and an open window. The back window is clearly tinted. However, at 30 seconds on the body cam video, as -- at a point at which Sgt. Garrett has not yet gotten to the car, I could clearly see through the rear window to the silhouetted persons in the car. There were lights on the hotel building in front of the car, so those persons in the car were silhouetted. They were lit from the front of the car, and you certainly could not tell in detail who they were or what they looked like. But at 30 seconds, the video shows the two occupants of the car through the rear window. Even though it is a tinted rear window, it shows the two occupants of the car through the rear window silhouetted against the lights on the hotel building. And that was a very fleeting snippet from the body cam video. But all it would take is a fleeting snippet within the field of vision of Sgt. Garrett for him to see a furtive movement, or what we, in the vernacular, call a furtive movement.

The encounter, in terms of conversation with the individuals in the car, unfolded very quickly after Sgt. Garrett approached the car. He was told by the defendant very early in this encounter that they had just pulled up. That was decidedly inconsistent with the information that Ms. Patel had given to the 911 operator, which, in turn, was relayed to Sgt. Garrett. And Sgt. Garrett also smelled the odor of marijuana in the car. I don't know that that really makes a great deal of difference one way or the other. And the female occupant of the car, Ms. Payne, apparently had a

4

marijuana card, so I'm not sure that that really cuts one way or the other in terms of my analysis of the matter.

Sgt. Garrett approached the car. He started his body cam video. And at a little after a minute into the encounter, as recorded on the body cam, he told the defendant he wanted to check him for guns. At a minute 34 seconds, the defendant says "Check me," with the emphasis on "me," as if there wasn't a reason in the world for Sgt. Garrett to be checking him for guns.

The conversation ensued from there to the point that at three minutes -- and this is all per the video time counter, at three minutes the defendant was obviously evasive as to whether there was a gun in the car. That was really pregnant with the suggestion that the individual Sgt. Garrett was interrogating at that point knew more than he wanted to let on. That is an unescapable conclusion from the obvious evasiveness of the defendant about whether there was a gun in the car.

At that point, Sgt. Garrett was justifiably concerned that a gun was available one way or another, either in the parking lot or in the car. At that point, I think Sgt. Garrett's paramount concern was that there was a gun available in the parking lot because he had heard what he firmly believed to be the clunk type of a sound of an object, which could quite plausibly have been a gun hitting the pavement. In any event, at three minutes, the defendant is obviously evasive as to whether there was a gun in the car.

He is asked again about a gun at three minutes and 13 seconds. He says, "Not to my knowledge." At three minutes and 33 seconds, the female, Ms. Payne, is asked, "Are there any guns in this car?" At three minutes and 38 seconds, she's asked again. At three minutes and 39 seconds, she is told to, "Step on out," and that is step on out of the car. At three minutes and 42 seconds, Officer Reeder says, "You had to think about that too long," which I take to be Officer Reeder's comment about Ms. Payne's delay in acknowledging that a gun was in the car.

But at any event at four minutes and 14 seconds, Ms. Payne did confirm that there was a gun in the car. And under all the circumstances, it would appear that -- and this was not audible to me, but it would appear, under all the circumstances, that it was likely that the officers received some sort of confirmation even before four minutes and 15 seconds from Ms.

Payne that there was, in fact, a gun in the car. At that point, there was every good reason for Sgt. Garrett's concern that he already had for officer safety to be heightened.

At that point, with the confirmation that there was a gun in the car, Officer Garrett had, in my view, as his first priority, and this would have been really, from a common sense standpoint, obligatory to find out what the story was with the gun. Is there a gun in the car? Is there a gun in the parking lot? At four minutes and 22 seconds, Ms. Payne gave consent to search. At five minutes and nine seconds, Officer Garrett said he had found a bullet in the car and that the bullet was in plain view, and that it was in the front passenger floorboard of the car. Now, that's what I heard at five minutes and nine seconds. But he was reporting that he had found the bullet in the car, so it was sometime, perhaps even a matter of seconds, before five minutes and nine seconds that Officer Garrett, in fact, found the bullet that he reported at five minutes and nine seconds that he had found.

At six minutes and seven seconds, Officer Garrett says, rather insistently to the defendant, but quite understandably, "Where'd you toss the gun?" He proceeds to look for the gun and Lt. Childs is also, at that point, looking for the gun. At eight minutes and 50 seconds, the defendant is handcuffed. At nine minutes and 50 seconds, the defendant is checked once again for a gun because Officer Garrett was concerned that his initial patdown had failed to disclose the presence of a gun on the person of the defendant.

At 11 minutes and 50 seconds, Officer Garrett copied down the VIN number of the car. About a minute later, at 12 minutes and 52 seconds in a response to an inquiry from Officer Garrett, the defendant said he was a felon.

So here we are at 12 minutes and 52 seconds into the encounter as recorded on the body cam video. So we're less than 15 -- I'm sorry, less than 13 minutes into the encounter, Sgt. Garrett had found a bullet, he had been told by the driver that there was a gun in the car and he knew the defendant was a felon. I think the -- if you will, the convergence of that information in Sgt. Garrett's mind at 12 minutes and 52 seconds was potentially very significant.

At approximately 13 minutes and 15 seconds, Officer Garrett ran a record check on the defendant and Ms. Payne. He confirmed that Ms. Payne was the owner of the car. At 17 minutes and 24 seconds, the report was, as I recall from the video, that they were "both clear." This was a report to Officer Garrett.

At 18 minutes and 32 seconds, Officer Garrett asked the defendant what he thinks a bullet will do to him because, at that point, he had the bullet and he had the information that the defendant was a felon. At 19 minutes and 33 seconds, Officer Garrett found the gun on the passenger side of the car after, as he reported at the time, "banging on the power seat motor." In fact -- and I was a little bit confused about this when I first viewed the body cam video in chambers, but this was clarified by Officer Garrett here. At first I wondered whether, based on his comment as recorded on the body cam video, whether he had found the gun inside of the housing for the power seat motor. No, he did not. He banged on the power seat motor or the housing for the power seat motor, and the gun fell from under the seat behind the power seat motor.

At this point, Officer Garrett needs to know all he needs to know in order to know that this was going to be a real case.  He told dispatch that there will be charges for possession of a firearm, AFCF, which is vernacular for after former conviction of a felony. And at 22 minutes and 30 seconds, he calls in the serial number of the gun, and at 23 minutes and 52 seconds, the video ended. At no point in this encounter was the defendant given his Miranda warnings.

Transcript, doc. no. 41, p. 69, l. 8 through p. 78, l. 13.

## II.

Defendant, who was a passenger in the subject vehicle, seeks to suppress the firearm and all other physical evidence found by Sgt. Garrett.  The Tenth Circuit has recognized that "although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention." United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000).  However,

[t]o successfully suppress evidence as the fruit of an unlawful detention, a defendant must first establish that the detention did not violate his Fourth Amendment rights. The defendant then bears the burden of demonstrating a factual nexus between the illegality and the challenged evidence. Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not "fruit of the poisonous tree," either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.

*Id*. (citations, quotations omitted).

Defendant claims his detention was unjustified at its inception and was unreasonably prolonged once it was clear Ms. Payne was not in danger and no firearm was found in the parking lot to cause concern for community safety. In addition, he claims there was a factual nexus between his illegal detention and the discovery of the firearm. According to defendant, if he had not been present, there would have been no search of the car.

*Detention Justified at Its Inception*

The Fourth Amendment protects individuals from unreasonable searches and seizures, including unreasonable investigatory stops or detentions. In *Terry v. Ohio*, [392 U.S. 1 (1968)], the Supreme Court established that a law enforcement officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest. An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime. Although reasonable suspicion requires the officer to act on something more than an inchoate and unparticularized suspicion or hunch, the level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause.

United States v. McHugh, 639 F.3d 1250, 1255-56 (10ᵗʰ Cir. 2011) (quotations, citations and brackets omitted).

In this case, defendant was detained or "seized" for Fourth Amendment purposes when Sgt. Garrett asked him to exit the car and he obeyed his command. McHugh, 639 F.3d at 1256 (Fourth Amendment seizure occurs when the officer shows his authority, and the citizen submits to the assertion of authority). The court concludes that defendant's detention was justified because the facts, as found by the court and viewed in their entirety, establish reasonable suspicion of criminal activity. *See*, *id*. (reasonable suspicion existed to justify stop where activity occurred at 2:00 a.m.; the officers were aware the apartment complex had been the site for criminal activity in recent weeks and months; dispatch had informed the officers that the subjects were suspected to have a weapon in the car; and a security officer conveyed to the officers that the men had been lurking in the complex, made him feel uneasy, were acting "hinky," were not obeying his commands and attempted to exit the vehicle despite his orders); *see also*, United States v. Conner, 699 F.3d 1225 (10ᵗʰ Cir. 2012) (reasonable suspicion existed to justify investigative detention where reliable 911 caller reported observing a man exit a vehicle and place a pistol in his waistband after having heard someone yell "No, no;" the activity occurred at 11:00 p.m. in a high-crime area; and the officer perceived evasive behavior when the man walked into a parking lot upon seeing police when there appeared no reason to do so). Although defendant is not a white male as described by the hotel clerk, that fact does not negate the existence of reasonable suspicion. The court's evaluation of the matter is not swayed one way or the other by the reported race of the man with the gun. Reasonable suspicion is not an "onerous standard" and takes into consideration "the totality of the circumstances." United States v. Pettit, 785 F.3d 1374, 1379 (10ᵗʰ Cir. 2015). Here, the totality of the circumstances established reasonable suspicion to justify the investigatory detention at its inception.

*Detention Not Unreasonably Prolonged*

In briefing, defendant argues that his detention was unreasonably prolonged. Specifically, in his supplemental briefing, defendant argues his detention was unreasonably prolonged once it became clear that Ms. Payne was not in danger and no firearm was found in the parking lot to cause concern for community safety.

"A *Terry* stop may only last long enough to address the reason for the stop, and related safety concerns." United States v. Goebel, 959 F.3d 1259, 1267 (10th Cir. 2020). "In addressing such an argument, [the court] must 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Id*. at 1268 (quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)).

The court concludes that defendant's detention was not unreasonably prolonged. Even though defendant and Ms. Payne had been separated, that fact, in the court's view, did not dispel reasonable suspicion of criminal activity. Defendant had given inconsistent information about how long they had been in the parking lot and had been plainly evasive about whether there was a firearm was in the car. Throughout defendant's detention, Sgt. Garrett was diligently searching for a firearm. This was reasonably related in scope to the circumstances that first justified the interference by the officers. The hotel clerk had indicated that a gun held by the male was visible, Ms. Payne had informed Sgt. Garrett a gun was in the car and he had found a bullet in plain view on the floorboard of the passenger side of the car where defendant had been sitting, and where Ms. Payne indicated the firearm would be. In addition, Sgt. Garrett had heard a clunk type sound of an object, such as a firearm or magazine, hitting the pavement. Shortly before Sgt. Garrett handcuffed defendant, he was still inquiring as to where defendant had tossed the gun. After he was handcuffed, Sgt. Garrett checked defendant once again for the firearm,

concerned that his initial pat down had failed to disclose the presence of the gun on defendant's person.   Thereafter, Sgt. Garrett ran the routine record check on defendant and Ms. Payne.   Subsequent to the record check, at 19 minutes and 33 seconds from activation of the body camera, Sgt. Garrett found the firearm under the passenger seat.   In the court's view, Sgt. Garrett diligently pursued the available means of investigation during defendant's detention.

The court also concludes that Sgt. Garrett's failure to find the firearm after his search of the parking lot did not dispel safety concerns.   The existence of a firearm had been confirmed by Ms. Payne (at the latest, 4 minutes, 14 seconds into the encounter) and Sgt. Garrett had found a bullet in the car (at the latest, 5 minutes, 19 seconds into the encounter).   The court concludes that the missing firearm remained a safety concern for the officers and the public.   As stated, shortly before defendant was handcuffed, Sgt. Garrett was still inquiring as to where defendant had tossed the gun.   Taking all of these circumstances into account, it is difficult to conceive that a responsible officer would have just called it a day.

That state law does, in some circumstances, permit the carrying of a firearm is not dispositive of the reasonableness of Sgt. Garrett's actions.   As observed by the Tenth Circuit in United States v. King, 990 F.2d 1552, 1561 (10th Cir. 1993), "[a defendant's] lawful possession of the pistol has no bearing on the reasonableness of [a police officer's] actions because the interest justifying [his] separation of [a defendant] from the pistol is [his] safety, and a legally possessed weapon presents just as great a danger to [his] safety as an illegal one."   Even if possession of the gun had been lawful under Oklahoma law (and, more to the point, assuming that Sgt. Garrett had no solid reason to suppose that possession of the gun was not lawful), Sgt. Garrett had a valid interest in ensuring his safety and the safety of others in ascertaining the whereabouts of the firearm.   As stated, at the time defendant was handcuffed (at 8 minutes, 50 seconds), the firearm was still missing.   It was not clear

11

to Sgt. Garrett whether the firearm was in the parking lot, in the vehicle or on defendant's person.

*No Factual Nexus Between Detention and Firearm*

Even if the continued detention was unreasonably prolonged, defendant must demonstrate a factual nexus between his continued detention and the firearm. Nava-Ramirez, 210 F.3d at 1131. "In order to show such a factual nexus, '[a]t a minimum, [defendant] must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'" United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001) (quoting Nava-Ramirez, 210 F.3d at 1131). As in the DeLuca and Nava-Ramirez cases, defendant has not shown that had he asked to leave the scene of the investigative stop, he would have been able to do so in Ms. Payne's car. Consequently, in the absence of evidence pointing the other way, the court concludes that, regardless of the defendant's presence, the detention of the vehicle and its owner would have continued and the officer would still have found the firearm. DeLuca, 269 F.3d at 1133. Ms. Payne had not only told Sgt. Garrett that a gun had been on the passenger side of the vehicle, but she had also given her consent to the search of her car. On his first look into the vehicle, Sgt. Garrett had saw a bullet in plain view on the floorboard of the passenger seat. The court is satisfied Sgt. Garrett would have continued to look for the firearm to ascertain its whereabouts. Defendant must show that "the [firearm] would never have been found but for *his*, and only his, unlawful detention." DeLuca, 269 F.3d at 1133 (emphasis in original). Defendant has not done so; therefore, he has not met his initial burden under Nava-Ramirez.

III.

In addition to the firearm, defendant seeks to suppress statements made "while he was detained and handcuffed in the back of Officer Garrett's police vehicle." Doc. no. 30, p. 6. Defendant claims those statements were made without the benefit

of <u>Miranda</u> warnings and in violation of his Fifth Amendment rights.  Plaintiff represents it does not intend to offer any statements made by defendant while he was detained in Sgt. Garrett's patrol car.  Doc. no. 37, p. 1.  And it specifically represents that it does not oppose defendant's motion as to statements made "in response to Sgt. Garrett's questions about [defendant's] status as a felon and regarding his probation. . . . ."  Doc. no. 44, pp. 1-2.

In light of plaintiff's representations, the court finds that defendant's motion should be granted to the extent it seeks to suppress statements made by defendant after he was handcuffed and detained in Sgt. Garrett's patrol car without first giving the <u>Miranda</u> warnings.

IV.

For the reasons stated, defendant, David Ashard Samilton's Motion to Suppress Evidence Obtained as a Result of an Illegal Search and Seizure and in Violation of his Fourth and Fifth Amendment Rights (doc. no. 30) is **GRANTED in part** and **DENIED in part**.  The motion is **GRANTED** to the extent it seeks to suppress statements defendant made while detained and handcuffed in the back of Sgt. Garrett's patrol car.  The motion is **DENIED** to the extent it seeks to suppress the physical evidence obtained from the vehicle in which defendant was a passenger.

IT IS SO ORDERED this 29th day of April, 2021.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

20-0284p009.docx